21-3102. Mr. Maynard. Thank you. Judge Parker, Judge Lohier, Judge Lynch, may it please the court. The sale of naloxagol and constitutional isomers of cocaine is not criminal in New York State. Accordingly, Minter's 2014 conviction for criminal sale of a controlled substance in the third degree is a serious drug offense under the ACCA. The whole point of the categorical approach is simple. It makes sure that when Congress decided to enhance a defendant's penalties where he had previously been convicted of a certain crime, he had in fact been convicted of that crime. Here, Minter argues using the categorical approach that he could have been convicted of a crime, neither of which is a federally controlled substance. The problem is that nobody can seriously dispute that New York State does not treat those as narcotic drugs as defined under New York State Penal Law 220.007. What do you mean does not treat them? The issue is not actually what they do, it's what they could do, isn't it? Well, it's both, Your Honor. There are two questions. The question is, is it actually listed on the face of the statute? That is, is it a possible element to which the person could have pled guilty or been found guilty by a jury in the state of New York? So here the question is, are they narcotic drugs? The court addressed this in Townsend and in Thompson where it said, look, it doesn't matter whether people are often prosecuted for possessing chorionic gonadotropin, which everybody agreed. Possessing what? I'm sorry, chorionic gonadotropin, which is a Schedule III drug in New York. It's also known as HCG, or human growth hormone. If I could have done organic chemistry, I would have been a doctor. Excuse me, when you say New York doesn't treat them as narcotic drugs, you mean as a matter of law they are not classified as narcotic drugs. In other words, you're not arguing about whether anyone's ever actually prosecuted for it, which apparently doesn't matter, but whether the law treats them as narcotic drugs. That is right. However, the second question of whether anybody's actually prosecuted does kick in if you get to the realistic probability test. And that's why I was saying it that way, was to try to merge the two. But Your Honor is absolutely right. We need to separate them out. The point that you've been making, I think, is in the first instance, the legal question. Exactly. So as a matter of law, you could scour New York's state schedules and you will not see the words naloxicol or any of the constitutional isomers of cocaine. Right. But you do see terms that describe categories of drugs in terms of their derivation or their chemical structure or something else that cover a group of drugs. Right? So if you said, if New York law said anything about cocaine being made from cocoa leaves, you would know that they prohibited cocaine. That's right. Even though you would scan the statute in vain for cocaine. That's right. The problem here is that the terms that are used to capture naloxicol or constitutional isomers of cocaine are terms that are not defined in the statute. And one of the problems here... The term that's used is isomers. The terms that's used is isomers, however, the court has the advantage of being able to look back and see what did courts and others who were relying on experts at the time understand the word isomers of cocaine to mean. And in case after case after case, and we cited a long list of cases, and I think it was pages 35 through 39 of our principal brief, every single court up until 2019, when this issue was first raised, found the same thing, which is those eight isomers of cocaine. I'm sorry. Most of those cases post-date the New York statute. That's right, but only by a year or two, including this court saying in 1983 that there are only eight isomers of cocaine. That is natural cocaine and its seven optical and geometric isomers. And we are definitely bound by anything that prior panels of this court say about chemistry. To the extent that it's a precedential holding that was argued below, yes, Your Honor. But at the same time, there's legislative history here. I mean, what happens, it seems to me, is that there is this idea in the air around that time that there's a problem because of certain very particular isomers of cocaine. And so there's this argument being made by defense lawyers, like sort of similar reasons to being made here, that you can't tell what this guy was selling was cocaine because it's only L-cocaine rather than D-cocaine or vice versa. I can never get that sprayed at it. I'm not normally dyslexic on left-right, but on this thing, I can't get it. But whatever it is, that idea was being argued in the courts. And the New York legislature, one could read the legislative history as saying, said, we don't care. All isomers. We're not going to say L and D. We're not going to do just isomers. So why are we to assume that they didn't mean to cover all of them, not just the ones that are in the air at that moment, but anything that some clever lawyer comes up with later on or some clever chemist comes up later on? We don't care. It's all cocaine to us. Because every hint from the time and everything passing for decades after it is, at the time, courts, and remember, the legislature was reacting not to something that was happening in a lab, but something that was happening in courts. That is, this was a direct response to the cocaine isomer defense in courts, as opposed to, say, a legislator saying, I recently read in the New England Journal of Medicine, X, Y, and Z, everything that was happening in courts said that when you talk about all isomers, you are talking about eight substances. You're talking about optical and geometric isomers. So then why did Congress find it necessary to define isomers in so many words to mean only geometric and optical? If everyone understood, that's all there is. Well, one realistic possibility is that they meant to make clear that it extended to geometric and optical isomers. That way somebody didn't say, are they only referring, for example, to optical isomers, which was the only one that was actually raised in courts. And then there was this side testimony that you read about in these cases that they said, look, there are these other six isomers floating out there, the geometric isomers of cocaine, and we just want to make sure that we're covering those as well. So I think that's a way for Congress to make sure, hey, we're covering both geometric and optical isomers. We're heading off this geometric isomer problem at the pass. That is, it's easy enough to read it as saying, it's expanding it out to geometric and optical isomers, and not that it's limiting it to geometric and optical isomers. And one thing to tell in that is that in the entire schedules, nowhere does it ever say expand something to constitutional isomers. Occasionally, it says expand it to positional isomers. There are two states that refer to positional isomers. I assume that, am I right? I'm not so good at chemistry either, that constitutional isomers is a larger category that includes positional isomers. That's right. There are at least 12,700-some-odd constitutional isomers that have been found thus far of cocaine. There are probably many more. Those are just the ones that have been identified to the various publications. And of those, there are two positional isomers that were created in laboratories, one in 1896 and one in 1970-something, that were each created once. And positional isomers are fundamentally different from optical and geometrical structure. The less likely it is to have any effect like those, we say. I was going to ask the New York Court of Appeals to interpret the New York law for us, but I'd be embarrassed. We'd have to say, we in the federal system are doing absolutely insane things and having totally ridiculous rules. And so we need to ask you a question of New York law that is almost inconceivable could ever be presented by a case that rises through the New York courts. So maybe we want to stay away from that to protect our reputation. And you're not asking for the appeals? No, no one's asking for that, apparently. And moreover, it would be understandable, although I also obviously share the inconceivable thought about this. But beyond that, one of the reasons that this court doesn't have to do that, beyond not wanting to do that, is that the Supreme Court has set forth another option short of doing that, which is it says, look, when something is so vague and you're really just using these crazy hypotheticals to come up with ways to satisfy the elements that don't appear on the face of the statute, you get to use the realistic probability test. And that's where we get to that second part that I was trying to merge the two into one, which is it says, look, if you have something that reading the statute on its face, it doesn't necessarily reach this. And you're saying, but is this a clever lawyer trying to find a way to shoehorn something in that's not apparent on the face of the statute? You get to say, because the concept of the categorical approach is simply, let's figure out if there's a chance that Dave Minter was actually convicted for selling an anti-constipation medication or selling an anti-nausea medication. All we have to do is say, has anybody ever been prosecuted for that successfully? Has a court ever found it to so apply? And the Supreme Court said this out and said, look, once you get that far, that is basically, once the defense lawyer has started to use his imagination, he has to back it up at a certain point by saying, there's somebody somewhere who has been successfully prosecuted for this. And nobody has ever claimed, as far as I know, not only in this case, but any of the other cases dealing with this, that anybody in New York has ever actually been prosecuted for selling naloxagol, which is readily available by prescription. Anybody on this court with a prescription in hand could walk three blocks to a Duane Reade and get naloxagol or get scopolamine, which is an anti-nausea medication that's a constitutional isomer of cocaine, without violating any laws. And the pharmacist there wouldn't be violating any laws either. The pharmacist there wouldn't treat... If we disagree with you about your assessment of Gibson, 1 and 2, as law of the case and not a broader holding, can you prevail? If you disagree with me on that, I think that the alternative, well, A, we could prevail on the timing issue there, because Gibson was only talking about timing in light of the guidelines, and the ACCA is different. But B, if this court... I assume that what Your Honor is asking is, look, if we were to apply Gibson's analysis of timing under the guidelines here, which we agree is precedential, and we were to find that Gibson's one line stating that there's a mismatch is, in fact, precedential, in spite of the fact that it's not an issue that was argued below, if that were to happen, then the answer is that Mr. Gibson, for an affirmative basis, would be correct. And this court would have to affirm Judge Kavanaugh. But your argument about Naloxonol, anyway, is that that holding is sort of... only arose in Gibson not as a decided matter, but as a matter that was treated as waived. Don't you have the same problem here? Did the government below... Yes, we did. Raise this issue that Naloxonol is not prohibited by New York law? We absolutely did, Your Honor. We raised the timing issue with Naloxonol, and we raised the mismatch issue with Naloxonol, and Judge Kodal simply said he didn't have to... He didn't have to reach that because he went off on the isomer issue. Exactly. And to him, it made it easier because he had previously found, in contravention to Gibson, on the timing issue in another case. And so to him, I think that this was a much easier way to resolve it was the cocaine issue. But we had raised it and it was fully briefed below, which is one of the reasons that there is a record here for this court to go on in deciding that affirmative basis. And that's why there is, in fact, a record on which Minter has properly requested an alternative basis for affirmance. Thank you. Thank you. Thank you, Your Honor. And you reserve some time for rebuttal. Thank you. Mr. Cohen. Good morning, Your Honors. May it please the Court, Derek Cohen, Walden, Mott, and Herron on behalf of the appellee, Dave Minter. The law is clear and it's undisputed here that in order to be deemed a serious drug offense for purposes of the Armed Career Criminal Act, a state conviction cannot be based on a state narcotic statute that is broader than its federal counterpart. At least 12 district court decisions in this circuit have correctly concluded that the New York State statute is indeed broader than its federal counterpart. No court anywhere has adopted the government-strained arguments with regard to this issue, and I respectfully submit that this court should not be the first. As the court has discussed here, there are two independent bases upon which this court could approve and affirm the district court. I'll start with the Isomer issue because that's where Judge Kodal resolved the issue below. And I would point this court to the Eighth Circuit in the case of U.S. v. Owen, which was a recent decision that involved pretty much identically the same facts, the interpretation of a Minnesota state statute which banned all isomers in connection with the application of the Armed Career Criminal Act. And the Eighth Circuit, I think, is instructive in the way that they approached this. And what they said was essentially cocaine has multiple isomers, and the problem for the government is that federal law criminalizes just two, optical and geometric isomers. Minnesota statute, by contrast, bans them all. Well, the same is true here. As every single court that has addressed this issue has found, the plain text and the legislative history is made clear that New York intended to cover all isomers of cocaine. And the legislative history could not be clearer on this point. Would you address the realistic probability argument? Sure. So realistic probability. I submit that the government, it was not a mistake that they sought to merge the issues in their argument. But in fact, what the law is, it's very much separate. The realistic probability test only comes into account and into being with regard to interpretation if there is ambiguity on its face. No court, no court has found it necessary to apply this test because the law is clear on its face. The New York state statute applies to all isomers of cocaine. The legislative history, as this court referred to in its question, dealt with exactly that. The irony here is that it sort of flipped on its head. What the New York state legislature sought to do was take chemistry out of the equation and basically say we don't want to turn, to clog our courts with different arguments and chemists and experts coming in. So what we're going to do is prohibit all isomers of cocaine. Additionally, as we point out in our briefs, we don't have to go to the Court of Appeals. We do have an opinion, an appellate opinion, with regard from the second department, which confirms exactly that. That says that a controlled substance under Schedule II of the Public Health Law, Section 3306, includes cocaine and all of its isomers. There's no question, but also here, because of the rulings in New York state, that require there to be a proof of the particular isomer. So to then go, there is no record to go back on and to determine what particular isomer was prosecuted in the case, and that was by design. So no court has looked at the realistic probability. New York state law would make it impossible to conduct such an actual review because that was precisely what the legislature sought to do. There is no record. There aren't chemistries saying which of the particular isomers they were. Every court that's looked at has concluded the same way. And as the Eighth Circuit said, and I think that this is an instructive way to look at this issue, the Eighth Circuit said it's not our job to quote, rewrite the state to conform to federal law or a supposed practical understanding of the drug trade. Respectfully, this issue is out there. The government doesn't like its result, but to the extent that they want to have that argument, that argument ought to be in Albany and not here in Foley Square. Putting aside the isomer issue, the naloxone... Can I just ask though, the thing that is, it always seems to me we're dealing in a weird fantasy land in some of these cases under the categorical approach, but it does seem particularly strange, speaking of the isomer case first, that a widely prescribed and sold anti-sea sickness drug that probably if you wanted to send cops down to the piers when a cruise is taking off, you could have quite a... Had your statistics for arresting people for possessing cocaine isomers. How can it be that that would really be a crime under New York law? Conceitedly, I would imagine the police would have easier times making other arrests at the piers on drugs that were clearer, but that's really not the issue. And I understand that there is, it can lead to a legislative fix, not a judicial one. The law is clear. Nobody disputes the idea that if the New York state statute is broader, then it can't serve as the predicate. And every court, every single court has found that, that has addressed this issue. And including the A Circuit very recently, I think on pretty much exactly the same basis here, the Minnesota state statute was passed for the same reason. Does that eliminate the realistic probability test in certain contexts? I think it eliminates it... I never said that, if so. I'm sorry, your honor, I didn't hear that. You said that, if so. I think that it eliminates the realistic probability for this particular issue because there's no ambiguity here. Certainly, it doesn't eliminate the concept of realistic probability in a case where there was actual ambiguity with regard to a statute. Here, you have a dozen judges in this circuit alone who've all concluded there's no ambiguity. In a sense, your argument is that if we applied the realistic probability test where there is no real ambiguity in the plain meaning of the statute, that would be a neat little end run around the entire categorical approach. That's exactly right. Virtually every case that has been decided under the categorical approach is one in which, one is hard put to think of realistic probabilities of prosecution on some of the hypotheticals that are generated. I think that's exactly right. That's why it comes up in that context. And this is what we, I think, said in Hilton. Yeah. And so, I'll talk about Naloxone for a moment, and I'll only just, given the lack of time, I'll just hone in on what I think the real question remaining is, which is, should you treat this decision differently under the Armed Career Criminal Act versus the guidelines? I want to point out, first of all, that if you look at the government's own opening brief in this case, it conceded, on page six of its opening brief, that although Bias Medina presented the question in the context of the guidelines, the analysis is the same as that confronted by this court in this appeal. Does a narcotic drug under the New York State statute categorically include substances not prescribed by the CSA? It's a shifting that's been going on. I believe Gibson 1 was clear. I believe Gibson 2 was exceedingly clear. And now this is the last bit, but it's inconsistent with how it's been. But if you just want to talk about the merits, there's no reason to treat the Armed Career Criminal Act any differently. First of all, the Armed Career Criminal Act is, in fact, implemented into the guidelines itself at 4B1.4a. Obviously, a court has to, in any sentencing, do a sentencing guideline calculation beforehand. But the policy reasons that were cited with regard in Gibson 1 and 2, that the timing decisions apply equally to the Armed Career Criminal Act. There's an evolving classifications of substances under the CSA. The schedules at the time of a conviction have no relevance necessarily to what the state law crime is. Under a time of conviction approach, a defendant could be subject to enhanced punishment for an offense that is no longer a federal crime. And Congress would have not intended that changes to CSA would be ignored in connection with controlled substance related principles of enhanced sentencing for contemporaneous offenses. All of those things apply with equal force to the Armed Career Criminal Act as it would to a career offender. And that would be a real odd result, and I would submit would be an unjust result to have it be treated this way. I would also point out with regard to the issue of a time of federal offense or time of sentencing approach, either of which would, in Mr. Minter's case, make his conviction inapplicable. The 3rd, 4th, 8th, and 10th circuits have all applied that same timing approach that was recognized in Gibson 2. So the 11th circuit, in your view, got it wrong? Yes. And, you know, so it relies on McNeil, which at least with respect to the central passage that the government points out, deals specifically with ACCA as differentiated from the guidelines. Could you just address that? Yeah, I think, and it's, the reading, first of all, I would say, respectful to the 11th circuit, I do think that they got it wrong as a matter of policy and how it would apply for all the reasons I've stated. But I also think- You don't have to be respectful of the 11th circuit. Well, you know, there is a live stream, and you never know. I practice a lot of places. In Gibson, I believe, this court expressly rejected the reasoning of McNeil with regard to the application of the backward looking of time. And then I think by extension would also reject the reasoning of Jackson. I understand that that's an outlier with regard to that. I think it's wrong as a matter of the policy. It's wrong as a matter of law. It's obviously not precedential, and it's against the weight of all the other circuits that have looked at it. Thank you very much, Your Honor. Mr. Maynard. Thank you. Mr. Cohen kept on referring to the idea that, quote, on its face, the narcotic drug is broader than the CSA. However, that's not true. This court saw in Townsend and Thompson what on its face means. In Townsend and Thompson, and I apologize for uttering the name of the drug again, the schedule specifically included the words chlorionic gonadotropin, which is a substance that is not in the federal schedules. And everybody agreed it was not in the federal schedules. The problem here is that the words derivative and isomer are ambiguous. These are terms that are not subject to a binary understanding in the way that people sometimes think chemistry terms are. I'm sorry. So I think that your friend, Mr. Cohen, mentioned, was it Burnett, people v. Burnett, and he talked about the fact that it's not ambiguous what this means. When you say it's ambiguous, why exactly, and I know you talked about this in your opening argument, but why exactly is it ambiguous if we get all these signals from not only Burnett but also potentially from us that it was not ambiguous? Well, let me, there are a couple of things there. And since Burnett dealt with cocaine isomers, let me start with cocaine isomers there. And then I can also get to the ambiguity of derivative, which is its own animal. When it comes to cocaine isomers, notably Burnett, when it said it reaches, quote, all cocaine and, quote, all of its isomers, it didn't define isomers. That is, it's saying within this undefined group it reaches everything within this undefined group. In Burnett, what was being raised was the classical cocaine isomer argument. The defendant in Burnett said, and Burnett lays this out, you never know, maybe I had D-cocaine on me. That's dextrococaine, the optical isomer of cocaine. And Burnett said, we don't have to worry about that. In the 1978 amendments, all of the isomers, including dextrococaine, were outlawed. But it doesn't say what the outer limits of those isomers are. So the actual holding of Burnett, that that might be loose language to say all because they didn't need to go that far. Precisely. They didn't need to go that far. And they didn't have somebody who said, maybe I was convicted of possessing scopolamine. What they had was somebody who said, I was convicted of possessing precisely what everybody seemed to agree was contained in the term isomers. Now, does the government really want to say that the term derivative is ambiguous? Because would that not mean that whenever you want to prosecute somebody in federal law for a drug that falls under the category of being derivative of something else, that the rule of lenity has to apply because it's a hopelessly ambiguous term? And we always have to decide that one in favor of defendants. That seems an odd argument for the government to be making. People are frequently prosecuted for drugs that are illegal on the theory that they are derivative within the meaning of the Controlled Substances Act of something else. Well, first of all, the problem is that it's not that the word derivative has no meaning whatsoever. The question is how broadly or how far it reaches. So if you have a one-step derivative, I think that every chemist on Earth would say that counts as a derivative. The problem here is we have naloxagol, which is derived from naloxone, which is not an illegal substance. But naloxone is itself derived in six steps from thebane, which is an opiate or opioid alkaloid. And what you have is that defendants would also have the advantage of the DEA interpretation when they're trying to figure out what does the federal statute mean. The DEA has said for federal statutory purposes, derivative has these four qualities to it. And the D.C. Circuit in Reckitt, in what was at the time a very important case to pharmaceutical companies, said, look, we look at the statute, which at the time, that part of it at least, was written virtually identically to the New York State statute. We look at the statute, and there's no way in the statute to tell what derivative means. And in fact, in this case, there was an administrative law judge who suggested a much narrower version of derivative that wouldn't have included naloxagol, because it didn't involve going through other stable substances to multi-step derivatives. But also through other substances, through another substance that is specifically excluded from the category of derivatives, right? Precisely. Which seems to me, I don't know that you made this argument in so many words, but rather than just saying, it's ambiguous whether they mean one step, two step, five steps, 12 steps, if the steps take you through something that is an excluded legal drug, and now you're deriving things from that, does that somehow break the chain? I mean, these are all very complex arguments that one wonders, you know, if you've ever tried to explain any of this to a normal person, or even to a normal lawyer who isn't already immersed in the tales of the categorical approach, you just get very blank, quizzical stares from such people. I hate to tell you how much dust I had to blow off of my old organic chemistry books when I first got presented with this, but I think that Your Honor is absolutely right, and in fact, we did make that argument, and I'm going to paraphrase because I don't remember the precise quotation, but we said it would be perfectly reasonable to assume or to believe that a New York State court would say a substance derived from naloxone, which is itself not a controlled substance, cannot be a derivative of a superior or first step substance above it. And in fact, if the answer is, well, as long as you can trace it back up, we have to assume that it covers anything, then right now, every single person in this courtroom is committing a crime because water can be derived from Thebane. And I don't think that anybody believes that we are all violating New York law every time that we drink. Well, one thing we've certainly proven is that it's not only defense lawyers that can come up with clever theories about how to apply the categorical approach. The government's got a pretty good staple of those, too. Thank you, Your Honor. Thank you. If there are no further questions.